**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JANET ANDERSON,**

                   **Plaintiff,**        **1:09-cv-360**
                                                  **(GLS\RFT)**

        **v.**

**DOLGENCORP OF NEW YORK, INC.,**

                   **Defendant.**
_____

**BETTY PULVER,**

                   **Plaintiff,**        **1:09-cv-363**
                                                  **(GLS\RFT)**

        **v.**

**DOLGENCORP OF NEW YORK, INC.,**

                   **Defendant.**
_____

**APPEARANCES:**                **OF COUNSEL:**

**FOR THE PLAINTIFFS:**
Beasley, Allen Law Firm           ROMAN A. SHAUL, ESQ.
P.O. Box 4160                  ELIZABETH A. CORDELLO,
218 Commerce Street        ESQ.
Montgomery, AL 36103-4160

**FOR THE DEFENDANT:**
Hinman, Howard Law Firm      JAMES S. GLEASON, ESQ.
P.O. Box 5250                  DAWN J. LANOUETTE, ESQ.
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902-5250

Morgan, Lewis Law Firm            JOEL S. ALLEN, ESQ.
1717 Main Street, Suite 3200      RONALD. E. MANTHEY, ESQ.
Dallas, TX 75201

**Gary L. Sharpe**
**District Court Judge**


## MEMORANDUM-DECISION AND ORDER

### I. Introduction

In this consolidated action, plaintiffs Janet Anderson and Betty Pulver allege that their former employer, defendant Dolgencorp of New York, Inc. (Dollar General) deprived them of lawful overtime wages in violation of the Fair Labor Standards Act (FLSA).[1] (*See* No. 09-cv-360, 2d Am. Compl., Dkt. No. 4; No. 09-cv-363, 2d Am. Compl., Dkt. No. 4.) Pending are Dollar General's motions for summary judgment as against each plaintiff and to strike certain evidence offered by plaintiffs in opposition to the summary judgment motions. (*See* No. 09-cv-360, Dkt. Nos. 38, 50; No. 09-cv-363, Dkt. No. 27.) For the reasons that follow, the motions are denied.

---

[1]29 U.S.C. § 201, *et seq.*

## II. Background[2]

### A.    Dollar General

_____

[2]Unless otherwise noted, the facts are derived directly from Dollar General's various Statements of Material Facts (SMF) and plaintiffs' responses thereto.  (*See* No. 09-cv-360, Def. SMF (Anderson), Dkt. No. 38:1; No. 09-cv-360, Def. Common SMF, Dkt. No. 39; No. 09-cv-360, Pls. Common SMF Resp., Dkt. No. 44:1; No. 09-cv-360, Anderson SMF Response, Dkt. No. 46:1; No. 09-cv-363, Pulver SMF Resp., Dkt. No. 27:1; No. 09-cv-363, Def SMF (Pulver), Dkt. No. 29:1.)  In that regard, the court notes that plaintiffs have failed in most instances to specifically admit or deny Dollar General's factual assertions as required by Local Rule 7.1(a)(3), instead choosing—in a somewhat boilerplate fashion—to "object" to the "implications" of those assertions or to assert additional facts that do not directly or necessarily contradict them.  (*See generally, e.g.*, Anderson SMF Resp., Dkt. No. 46:1; *see also* N.D.N.Y. L.R. 7.1(a)(3) (requiring a "non-movant's response [to] mirror the movant's Statement of Material Facts by *admitting and/or denying each of the movant's assertions* in matching numbered paragraphs"(emphasis added)).)  As plaintiffs' counsel is likely aware, however, the purpose of the Rule 7.1(a)(3) response requirement is not to highlight and broadly contradict intended "implications" of a movant's factual assertions, or to imply the inaccuracy of those assertions; it is to aid the court in isolating the relevant facts so that it may discern whether and to what extent disputes relating to those facts exist.  Thus, a non-movant's failure to tailor her responsive SMFs in accordance with the Local Rules significantly impedes the court's ability to effectively and efficiently resolve these critical inquiries. Accordingly, to the extent plaintiffs have failed to properly respond to Dollar General's statements of fact, the court will, where it deems appropriate, treat those statements as admitted for purposes of this motion.  *Id.* ("The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.").

Defendant Dollar General is a retailer of basic consumable goods, such as cleaning supplies, health and beauty aids, foods and snacks, housewares, toys, and basic apparel.  (*See* No. 09-cv-360, Def. Common SMF ¶ 1, Dkt. No. 39.)  As of 2005, Dollar General operated approximately 7,500 stand-alone Dollar General Stores in thirty states, with an average sales volume of over $1 million per store.  (*See id.* at ¶ 2.) Each Dollar General store is staffed by a Store Manager, an Assistant Manager (ASM), a Lead Clerk, and multiple store clerks.  (*See id.* at ¶ 3.) Of these employees, Store Managers occupy the highest level of supervisory authority and are the only employees paid on a salaried basis. (*See id.*)  Each Store Manager reports to a District Manager (DM), each of whom oversees from fifteen to twenty-five stores.  (*See id.* at ¶ 4.)

During the relevant times, Dollar General described a Store Manager's general responsibilities as "the management of all employees in the effective planning and implementation of all store processes, including ordering, receiving, stocking, presentation, selling, staffing and support." (No. 09-cv-360, Shaul Aff., Ex. 11, Store Manager Job Description, Dkt. No. 45:11 (filed under seal).)  Encompassed within these broadly-defined responsibilities are the specific, "essential" duties to:

4

- Recruit, select and retain qualified employees according to federal and state labor laws and company policies; ensure store is properly staffed;

- Provide proper training for employees; conduct performance evaluations; identify gaps for appropriate solutions and/or counseling, up to and including termination;

- Make recommendations regarding employee pay rate and advancement;

- Communicate performance, conduct and safety expectations regularly; coordinate meetings and events to encourage safety, security and policies;

- Ensure that the store is appropriately staffed and effectively opened and closed each day;

- Evaluate operating statements to identify business trends (including sales, profitability, and turn), expense control opportunities, potential shrink, and errors;

- Ensure that all merchandise is presented according to established practices; utilize merchandise fixtures properly including presentation, product pricing and signage;

- Maintain accurate inventory levels by controlling damages, markdowns, scanning, paperwork, and facility controls;

- Ensure the financial integrity of the store through strict cashier accountability, key control, and adherence to stated company security practices and cash control procedures;

- Provide superior customer service leadership;

- Maintain a clean, well-organized store; facilitate a safe
  and secure working and shopping environment;

- Ensure that store is adequately equipped with tools necessary
  to perform required tasks; and

- Complete all paperwork and documentation according to
  guidelines and deadlines.

(*Id.*)

The job description further outlines certain "Working Conditions and

Physical Requirements" associated with the Store Manager position.  (*See

id.*)  These include: "[f]requent walking and standing"; "[f]requent bending,

stooping and kneeling to run check out station, stock merchandise, and

unload trucks"; "occasional climbing"; and "frequent and proper lifting of up

to 40 pounds[, and] occasional lifting of up to 65 pounds."  (*Id.*)

With respect to compensation, in addition to their weekly salaries,

Store Managers are generally eligible for certain bonuses, such as annual

"Teamshare" bonuses and quarterly "in stock" bonuses.  (*See* No. 09-cv-

360, Def. Common SMF ¶ 13, Dkt. No. 39.)  Teamshare bonuses are tied

to the financial performance of the Store Manager's individual store and the

manager's individual performance as a manager.  (*See id.*)  To the extent

that Assistant Managers have also been eligible for Teamshare bonuses, it appears that their eligibility never exceeded 30% of what a Store Manager could earn.  (*See id.* at ¶ 14.)  As to in-stock bonuses, they were awarded in the amount of $250 per quarter if certain in-stock goals were met, and only to Store Managers.  (*See id.* at ¶¶ 13, 14.)

In assessing the financial performance of a Store Manager's individual store, Dollar General considers whether and to what extent the store is meeting its quarterly and annual sales goals, minimizing inventory shrink and controllable expense, and maximizing profit.  (*See* No. 09-cv-360, Allen Aff., Ex. 3, Store Manager Performance Evaluation Form, Dkt. No. 41:3 (filed under seal).  Relatedly, in evaluating a Store Manger's managerial and leadership skills, Dollar General examines the manager's performance in seven focus areas: sales volume, controllable expense, inventory shrink, merchandising/in stock, training and development, customer satisfaction, and safety awareness.  (*See id.*)

**B.    Janet Anderson**

In February 2002, plaintiff Janet Anderson was hired by Dollar General as an ASM for Store No. 8576 in Burnt Hills, New York.  (*See* No. 09-cv-360, Def. SMF (Anderson) ¶ 1, Dkt. No. 38:1.)  In April 2002,

Anderson was promoted to the position of Store Manager, which she held

until her resignation in November 2002.  (*See id.* at ¶ 2.)  According to

Anderson, other than the on-the-job training she received as an ASM, she

did not receive any training when she was promoted to Store Manager.

(*See* No. 09-cv-360, Anderson SMF Resp., Additional Facts ¶ 20, Dkt. No.

46:1.)

As a Store Manager, Anderson was paid a fixed weekly salary of

$425.00, was eligible for the performance-based bonuses discussed

above, and worked an average of fifty hours per week.  (*See* No. 09-cv-

360, Def. SMF (Anderson) ¶¶ 6, 8, 25, Dkt. No. 38:1.)  According to

Anderson, she understood when she took the Store Manager position that

she would be working more than forty hours per week, and that her salary

was to compensate her for all hours worked since she would not be paid

for overtime.  (*See id.* at ¶¶ 6, 7; No. 09-cv-360, Anderson SMF Resp. ¶ 7,

Dkt. No. 46:1.)  During Anderson's tenure as Store Manager, the next

highest paid employee, an ASM, earned $7.00 per hour and worked an

average of thirty-one hours per week.  (*See id.*)

With respect to her job functions, Anderson acknowledged in

deposition that she performed all of the duties outlined in the Store

8

Manager job description, and agreed that the description provides an accurate general summary of her position as Store Manager.  (*See* No. 09-cv-360, Def. SMF (Anderson) ¶ 15, Dkt. No. 38:1.)  In line with that testimony, Anderson explained that she was responsible for supervising the other store employees, including an ASM, a "Third-Key" or Lead Clerk, and the other store clerks, and for performing other managerial duties.  (*See id.* at ¶ 3.)

As part of her supervisory duties, Anderson testified that she trained employees on store policy and other related issues; directed, supervised, and evaluated employees' work; coached, disciplined, and counseled employees where necessary; recommended employee pay raises and promotions to her DM (recommendations that were always accepted); and scheduled employees' hours.  (*See id.* at ¶¶ 14, 16.)  With respect to scheduling, Anderson managed approximately 168 to 212 labor hours per week, meaning that she allocated Dollar General's labor hour allotment amongst the employees she supervised.  (*See id.* at ¶ 4.)

In addition to these supervisory tasks, Anderson also performed other duties, including interviewing and hiring employees; monitoring and evaluating weekly sales reports and store operating reports; ensuring that

9

cash registers "balanced"; completing daily paperwork, such as payroll and bank deposits; managing inventory levels; ensuring that merchandise was properly staged and stocked, largely in accordance with Dollar General "Plan-O-Grams"[3]; leading team meetings; and ensuring that the store was properly open and closed.  (*See id.* at ¶¶ 14, 16.)

Anderson also performed non-managerial tasks in her role as Store Manager.  Specifically, she testified to running the cash register, stocking shelves, facing products on the shelves, helping unload delivery trucks, and cleaning the store.[4]  (*See* No. 09-cv-360, Anderson SMF Resp., Additional Facts ¶¶ 4, 6, 7, Dkt. No. 46:1.)  With respect to the division of her time, Anderson testified to spending at least half of her time on managerial duties.  (*See* No. 09-cv-360, Def. SMF (Anderson) ¶ 26, Dkt. No. 38:1.)  Anderson agreed, however, that when she was performing non-

---

[3]"Plan-O-Grams" are store diagrams that direct the placement of products in a store.  (*See* No. 09-cv-360, Def. SMF (Anderson) ¶ 23, Dkt. No. 38:1.)  According to Anderson, however, because her store did not comport with the standard Plan-O-Gram layout, she relied largely on her own discretion to merchandise approximately fifteen of the store shelves.  (*See id.*)

[4]In addition to her routine duties, Anderson was also sent to two other Dollar General stores for two days each to set up the stores by setting up shelving and stocking merchandise.  (*See* No. 09-cv-360, Anderson SMF Resp., Additional Facts ¶ 19, Dkt. No. 46:1.)

managerial tasks, she would continue to monitor and manage the operation of the store.  (*See* No. 09-cv-360, Def. SMF (Anderson) ¶ 27, Dkt. No. 38:1.)  Anderson further testified that if Dollar General would have allotted larger labor hour budgets, she would have been able to focus more time on her managerial duties and less on non-managerial tasks.  (*See* No. 09-cv-360, Anderson Dep. at 237:11-16, Dkt. No. 38:4.)  According to Anderson, the labor budget was allocated such that only two employees, including herself, could typically be working at one time.  (*See* No. 09-cv-360, Anderson SMF Resp., Additional Facts ¶¶ 5-7, Dkt. No. 46:1.)  Often, then, as Anderson testified, she would stock the shelves, unload a delivery truck, or clean the store while the only other employee working would run the cash register.  (*See id.*)

In performing her duties as Store Manager, managerial or otherwise, Anderson was expected to act in accordance with Dollar General's standard policies and procedures.  (*See* No. 09-cv-360, Def. SMF (Anderson) ¶ 19, Dkt. No. 38:1.)  Those policies and procedures, which were contained in the company's Standard Operating Procedures Manual (SOP), provided direction in how to perform certain store operations.  (*See id.*)  According to Anderson, however, while the SOP provided general

guidance and direction, it did not cover every issue that would arise in the store on a daily basis.  (*See id.*)

During her tenure as Store Manager, Anderson reported to DM Bob Seaman.  (*See id.* at ¶ 12.)  Mr. Seaman, unlike Anderson, did not have an office in or a key to Anderson's store, but would visit the store on a periodic basis.  (*See id.*)  According to Anderson, Mr. Seaman visited her store approximately once every five to six weeks.  (*See id.*)  During those visits, which typically lasted one hour, Mr. Seaman would walk through the store with Anderson and provide her with ideas and recommendations for improving the store.  (*See id.*)  Anderson testified that implementation of these ideas and recommendations was not mandatory, explaining that she used some of Mr. Seaman's suggestions but not others.  (*See id.*)  Apart from these store visits, it appears from Anderson's testimony that her communications with Mr. Seaman were relatively infrequent.  According to Anderson, she spoke with Mr. Seaman on the telephone approximately six times—about once per month—and received a voice mail message from him every four or five weeks.  (*See id.*)  And with respect to those voice mail messages, Anderson testified that they were  typically "district wide" and not specific to Anderson or her store.  (*See id.*)  Overall, despite Mr.

Seaman's oversight, Anderson felt that she was "in charge" of her store,

and further testified that Mr. Seaman did not interfere with the performance

of her managerial duties.  (*See id.* at ¶¶ 13, 17. )

Ultimately, as noted above, Anderson resigned from her employment

with Dollar General in November 2002.  (*See id.* at ¶ 2.)

## C.   <u>Betty Pulver</u>

Plaintiff Betty Pulver was hired as a Store Manager for Dollar General

in April 2002.  (*See* No. 09-cv-363, Def SMF (Pulver) ¶ 1, Dkt. No. 27:1.)

At the time of her hiring, Pulver understood that she would be responsible

for opening and managing a new store in Hudson, New York.  (*See id.*; No.

09-cv-363, Pulver Dep. at 45-46, Dkt. No. 27:4.)  Prior to opening the

Hudson store, however, and for approximately one month after being hired,

Pulver worked at the Broadway store in Schenectady, New York,

apparently for training purposes.  (*See* No. 09-cv-363, Def SMF (Pulver) ¶

2, Dkt. No. 29:1.)  Pulver testified, however, that while at the Broadway

Store, the only training she received related to loading and unloading

delivery trucks and stocking shelves.  (*See* No. 09-cv-363, Pulver SMF

Resp., Additional Facts ¶ 10, Dkt. No. 29:1.)  According to Pulver, she

received no instruction with respect to following Plan-O-Grams or

completing  paperwork, and was given no experience running a cash

register, making a schedule, or opening or closing the store.  (*See id.*)

Pulver testified that the Store Manager who was supposed to train her went

on vacation a week after she started, leaving no training instructions with

the ASM who was left in charge of the store.  (*See* No. 09-cv-363, Pulver

Dep. at 50-51, Dkt. No. 27:4.)

In May 2002, with the opening of the Hudson store behind schedule,

Pulver was transferred to open a different store, the State Street store.

(*See* No. 09-cv-363, Def SMF (Pulver) ¶ 2, Dkt. No. 27:1.)  According to

Pulver, it wasn't until this transfer that she received training on completing

paperwork, scheduling, Plan-O-Grams, etc.  (*See* No. 09-cv-363, Pulver

Dep. at 53-54, Dkt. No. 27:4.)  Anderson testified that this training, which

was conducted over the telephone, occurred over the course of one month,

but did not specify the frequency or duration of each session.  (*See id.*)

Ultimately, in July 2002, Pulver was transferred to open the Hudson store,

where she remained as Store Manager until her resignation in July 2003.

(*See* No. 09-cv-363, Def SMF (Pulver) ¶ 2, Dkt. No. 27:1.)

In "opening" the Hudson and State Street stores, Pulver

supervised crews of twenty-five employees hired on a  temporary basis to

14

assist in setting up the stores.  (*See id.* at ¶ 3.)  Once the Hudson store was set up and ready to be opened, Pulver made recommendations as to which of the temporary employees should be hired on a permanent basis to staff the store's ASM and "Third Key Clerk" positions.  (*See id.*)  After the necessary hiring decisions were made and the Hudson Store was opened, Pulver began performing the duties and responsibilities associated with the day-to-day operations of the store.  (*See, e.g.*, *id.* at ¶¶ 4, 5, 12.)

Like Anderson, Pulver agreed in deposition that the duties she regularly performed as Store Manager matched those recited in Dollar General's description of the Store Manager position.  (*See id.* at ¶ 14.)  Those duties, as with Anderson, included managing the Hudson store's labor budget of 160 to 240 labor hours per week; directing and supervising the work of the ASM, Third Key Clerk, and store clerks Pulver supervised; ordering store merchandise; ensuring that merchandise was properly staged and stocked; interviewing and hiring employees; scheduling employees; ensuring the store was appropriately staffed and properly opened and closed each day; ensuring the safety and security of the store and employees; ensuring that all store paperwork was properly completed and forwarded to the Dollar General corporate office; recommending

employees for promotion (recommendations that were always accepted);

implementing Dollar General directives regarding, among other things, new

store policies and procedures, product recalls, and compliance with state

and local laws; and training, disciplining, counseling, and, under certain

circumstances, firing employees.[5]  (*See id.* at ¶¶ 4, 5, 12, 13, 15, 21.)

 In addition to these and similar duties, Pulver testified to also

performing non-managerial duties, such as stocking shelves, running the

cash register, cleaning the store, and unloading delivery trucks.  (*See* No.

09-cv-363, Pulver SMF Resp., Additional Facts ¶ 2, Dkt. No. 29:1.)

Like Anderson, Pulver testified to spending at least half of her time on

managerial duties.  (*See* No. 09-cv-363, Def SMF (Pulver) ¶ 26, Dkt. No.

27:1.)  She further agreed in deposition that when she was performing non-

managerial tasks, she was simultaneously managing the store, evaluating

employees, and ensuring proper customer service.  (*See id.*)  And like

_____

 [5]Pulver had the authority to terminate employees for certain types of misconduct, such as failing to report to work or cash register shortages, without District Manager approval.  (*See* No. 09-cv-363, Def SMF (Pulver) ¶ 13, Dkt. No. 29:1.)  In other situations, however, such as those involving employee performance issues, Pulver was required to seek her District Manager's approval before she could terminate an employee.  (*See id.)* According to Pulver, her termination recommendations were always followed.  (*See id.*)

Anderson, Pulver agreed that Dollar General's limited labor hour budget required her to spend more time on non-managerial tasks than she otherwise would have.  (*See* No. 09-cv-363, Pulver Dep. at 287:12-16, Dkt. No. 27:4.)

Also like Anderson, Pulver was required to comply with Dollar General SOP, and to follow Dollar General Plan-O-Grams in merchandising her store.  (*See id.* at ¶¶ 22, 23.)  But also similar to Anderson, Pulver testified that the SOP did not address every situation that could arise in the store on a daily basis, requiring her to exercise discretion in those situations.  (*See id.* at ¶ 22.)  As to Plan-O-Grams, Pulver testified that because her store did not always comport with the Plan-O-Gram layout, she would exercise discretion in deciding what products to place on approximately ten to twenty percent of the store shelves.  (*See id.* at ¶ 23.)

As with all Dollar General Store Managers, Pulver reported to a DM. (*See id.* at ¶ 10.)  Similar to Anderson's experience in that regard, Pulver's DM would visit the Hudson store for between one and two hours to review store paperwork and discuss employee performance and ways to improve the store's overall performance.  (*See id.*)  Pulver recalls only five of these

visits occurring during her tenure as Store Manager of the Hudson store, and testified that she rarely spoke to her DM on the telephone and that she could not recall receiving any voice mail messages from him.  (*See id.*) Rather, Pulver was responsible for leaving weekly voicemail reports for her DM regarding her store's sales performance.  (*See id.*)  Like Anderson, Pulver testified that her DM did not interfere with the performance of her managerial duties.  (*See id.* at ¶ 16.)

With respect to compensation, Pulver was hired at a salary of $423.00 per week.  (*See id.* at ¶ 6.)  Beginning in July 2002, however, and continuing until the end of her employment in July 2003, Pulver's weekly salary was $480.00.  (*See id.*)  Like Anderson, Pulver testified that she understood when she was hired that this weekly salary was to compensate her for all hours worked since she would not be paid for  overtime.  (*See id.* at ¶ 7.)  Pulver  testified to working between sixty and seventy hours per week as Store Manager of the Hudson store.  (*See* No. 09-cv-363, Pulver SMF Response, Additional Facts, ¶ 1, Dkt. No. 29:1.)  During that time, the next highest paid employee in the Hudson store, an ASM, earned $7.00 per hour and worked an average of thirty to thirty-five hours per week. (*See* No. 09-cv-363, Def SMF (Pulver) ¶ 8, Dkt. No. 27:1.)  In Pulver's view,

she was "worth more" than the other store employees because she had

more responsibilities, including hiring, firing, interviewing, scheduling,

assigning, disciplining, and training employees in her store.  (*See id.* at ¶

9.)  According to Pulver, she was "in charge" of her store.  (*See id.* at ¶ 11.)

**D.    Procedural Background**

   On March 21 and 29, 2004, Pulver and Anderson consented to join

numerous other plaintiffs in this collective FLSA action against Dollar

General, alleging that Dollar General improperly classified them as exempt

from the FLSA's overtime compensation requirement.  (*See* No. 09-cv-363,

Ex. B, Pulver Consent, Dkt. No. 27:11; No. 09-cv-360, Ex. B, Anderson

Consent, Dkt. No. 38:10; No. 09-cv-363, 2d Am. Compl., Dkt. No. 4; No.

09-cv-360, 2d Am. Compl., Dkt. No. 4.)  While the collective action was

originally filed in the Northern District of Alabama, Pulver and Anderson's

claims, among others, were transferred to this court, where jurisdiction and

venue is proper.  (*See* No. 09-cv-360, Dkt. No. 1; No 09-cv-363, Dkt. No.

1.)

   On May 11, 2009, Magistrate Judge Randolph F. Treece

consolidated Anderson and Pulver's cases for discovery, pretrial

proceedings, and the filing of common summary judgment briefing.  In addition, Judge Treece designated Anderson's case, No. 09-cv-360, as the lead case, directing all filings to be made to that docket.  (No. 09-cv-363, Dkt. No. 25.)

Now pending are Dollar General's motions for summary judgment as against each plaintiff and to strike certain evidence offered by plaintiffs in opposition to the summary judgment motions. (*See* No. 09-cv-360, Dkt. Nos. 38, 50; No. 09-cv-363, Dkt. No. 27.)

### III.  Standard of Review

The standard for the grant of summary judgment is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle,* 499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).

### IV.  Discussion

### A.    Motion to Strike

Defendants have moved to strike certain evidence offered by plaintiffs in opposition to the current motions.  (*See* No. 1:09-cv-360, Dkt. No. 50.)  That evidence includes documents relating to a 2004 Dollar General Survey, articles about Dollar General, Dollar General Story

20

Newsletters, and numerous other Dollar General internal documents.

Because the court has not relied on this evidence in rendering its decision,

Dollar General's motion to strike is denied as moot.  And to the extent the

motion seeks to preclude this evidence at trial, it is denied as premature.

**B.    The FLSA Overtime Compensation Requirement**

As noted above, plaintiffs allege that Dollar General deprived them of

overtime wages in violation of FLSA's overtime compensation requirement.

Dollar General responds that plaintiffs, as Store Managers, were properly

classified as "executive" employees and are therefore exempt from the

FLSA overtime requirement.

Under the FLSA, an employer must pay overtime to employees

working more than forty hours per week.  29 U.S.C. § 207(a)(1).  However,

individuals "employed in a bona fide executive ... capacity" are exempt from

the FLSA' s overtime requirements.  29 U.S.C. § 213(a)(1).  Congress has

not defined what it means to be a "bona fide executive employee," instead

delegating that responsibility to the Department of Labor (DOL), which has

promulgated a body of clarifying regulations.  *See* 29 U.S.C. § 213(a)(7);

29 C.F.R. § 541, *et seq.*  Under the pre-2004 regulations,[6] whether an

employee qualifies for the executive exemption is a question of law, and is

determined based on "different legal tests according to salary level."

*Donovan v. Burger King Corp.*, 675 F.2d 516, 518 (2d Cir. 1982) (citation

omitted).  Salaried employees earning more than $250 per week, like

plaintiffs here, must satisfy the so-called "short test" to qualify for the

exemption.  *Id.* (citing 29 C.F.R. § 541.1(f)).  To satisfy this test, the

employee must be one who regularly directs the work of two or more other

employees, and whose "primary duty" is management.  *Id.*

In this case, there is no dispute that Anderson and Pulver regularly

directed the work of two or more employees.  (*See* No. 09-cv-360, Allen

Aff., Ex. 1, Joint Stipulations of Fact ¶ 4, Dkt. No. 41:1; No. 09-cv-360, Pls.

---

[6]Effective August 23, 2004, the DOL regulations defining the executive exemption were amended.  *See* 69 Fed. Reg. 22,122 (Apr. 23, 2004).  Because the relevant employment of each plaintiff in this case terminated before the effective date of these amendments, the court agrees with Dollar General—and plaintiffs do not appear to dispute—that the pre-2004 regulations should be applied to plaintiffs' claims.  *See, e.g.*, *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 290 n.6 (E.D.N.Y. 2010) (applying pre-2004 regulations to pay periods predating amendment and amended regulations to pay periods postdating amendment); *Baden-Winterwood v. Life Time Fitness, Inc.* 566 F.3d 618, 629 (6th Cir. 2009) (same); *Slusser v. Vantage Builders, Inc.*, 576 F. Supp. 2d 1207, 1215 n.4 (D.N.M. 2008) ("The revised FLSA regulations adopted ... in August of 2004 do not apply retroactively.").

Common Response Br., Dkt. No. 44 (focusing solely on issue of primary

duty).)  Rather, the only issue in dispute is whether Anderson and Pulver's

primary duty as Dollar General Store Managers was management.

Whether an employee's primary duty is management under the

regulations is determined based on the following five factors:

> (1) time spent in the performance of managerial duties; (2) relative importance of managerial and non-managerial duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid employees doing similar non-exempt work.

*Donovan*, 675 F.2d at 521 (citing 29 C.F.R. § 541.103).  Thus, the primary

duty inquiry is "necessarily fact-intensive."  *Rodriguez v. Farm Stores*

*Grocery, Inc.*, 518 F.3d 1259, 1264 (11th Cir. 2008); *see* 29 C.F.R. §

541.103 (2002) ("[The] determination of whether an employee has

management as his primary duty must be based on all the facts in a

particular case.").  And given this "deeply factual ... inquiry ... courts are

often reluctant to grant summary judgment based on the executive

exemption."  *Indergit v. Rite Aid Corp.*, Nos. 08 Civ 9361 & 08 Civ. 11364,

2010 WL 1327242, at *7 (S.D.N.Y. Mar. 31, 2010).  Further, in examining

the primary duty factors, courts must be mindful that "[the executive]

exemption must be narrowly construed," and that "[t]he employer has the burden of proving that the employee clearly falls within [its] terms." *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009) (citations and internal quotation marks omitted).

**1.    Time Spent on Managerial Activities**

As to the first factor, the court must consider the amount of time Anderson and Pulver spent on managerial duties.  "'In the ordinary case[,] it may be taken as a good rule of thumb that ... an employee who spends over 50 percent of [her] time in management would have management as [her] primary duty.'" *Donovan*, 675 F.2d. at 520 n.5 (quoting 29 C.F.R. § 541.03).  "'Time alone, however, is not the sole test.'" *Id.* (quoting 29 C.F.R. § 541.03).  Where an employee "'does not spend over 50 percent of [her] time in managerial duties, [she] might nevertheless have management as [her] primary duty if the other  pertinent [factors] support such a conclusion.'" *Id.* (quoting 29 C.F.R. § 541.03).  In general, however, how an employee spends her time working is a question of fact for a jury.  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

Here, Dollar General argues that plaintiffs' deposition testimony should "end the legal analysis in its favor" because it conclusively

24

demonstrates that plaintiffs' spent more than half of their time on

managerial activities.  The court disagrees.  As to Anderson, Dollar

General points to the following exchange:

> Q:  .... When you're just performing management type
>      duties, would you say that would be half of the time?
>
> A:   At least.
>
> Q:  Okay. So over half?
>
> A:   Yes

(No. 09-cv-360, Anderson Dep. at 211:7-12, Dkt. No. 38:4.)  However,

when later asked how much time she spent on non-managerial duties,

Anderson responded, "[e]asily half the day," arguably implying that she

may have spent more than half the day on those duties.  (*Id.* at 242:5-12.)

Following this response, the following exchange ensued:

> Q:  You're not changing your testimony that you spent more
>      time performing managerial duties than you did non-
>      managerial duties, are you?
>
> A:  No, I don't think so.

(*Id.* at 242:22-25.)  Pointing to this latter exchange, Dollar General

dismisses Anderson's contention that she spent "half of her day" on

managerial duties, arguing that Anderson's "testimony is unequivocal that

she spent more time performing managerial duties than non-managerial

duties." (No. 09-cv-360, Def. Resp. (Anderson), at 4-5; Dkt. No. 52.)

Having reviewed the deposition transcript, and construing all reasonable inferences in Anderson's favor, the court is not persuaded that Anderson's testimony compels summary judgment. Specifically, given Anderson's arguably inconsistent responses, her less than definitive "clarification" of those responses, and the fact that her testimony was based upon what appear to be rough estimations of the time she spent on certain duties, the court is not satisfied that Anderson's testimony is conclusively unequivocal.

The same is true with respect to Pulver. As to her testimony, Dollar General points to the following exchange as unequivocal proof that she spent more than half her time on managerial activities:

> Q:   ... So you spent more than 50 percent of your time on managerial work before you even think about what you did when you were doing the nonmanagerial work and you were still supervising and operating the store, but just out and out managerial work, you spent more than have your time on it didn't you?

> A:   Sitting down and thinking about it all, yes, maybe at the time I didn't feel like I was doing, you know. But sitting down here and talking and thinking about it, yes.

(No. 09-cv-363, Pulver Dep. at 252:24-25, 253:2-10, Dkt. No. 27:4.) As with Anderson's testimony, however, additional portions of Pulver's

testimony weigh against characterizing this exchange as an unequivocal

admission.  For example, when the "time spent" issue first arose, Pulver

testified as follows:

> Q:  And if we were trying to get a handle on how much time
>  you spent on the non-managerial duties, stocking,
> cleaning, waiting on customers, running a cash register,
> cleaning up, those would be less than half of the time?
>
> A:  I wanna say no because a lot of paperwork I took home
>  and did on my own time.  The scheduling did home, on my
>  own time.  I did a lot of stocking and –
>
> Q:  I'm not saying you didn't do a lot of stocking.
>
> A:  But I spent as much time – I want to say as much time
>  doing both.  I mean, I was constantly on the floor helping
>  and stocking.
>
> Q:  So you would say about 50/50 doing
>  management/nonmanagement?
>
> A:  Yes.

(*Id.* at 247:13-25, 248:2-5.)  Again, having construed all reasonable

inferences in Pulver's favor in light of this arguably inconsistent testimony,

the court disagrees with Dollar General that it is entitled to summary

judgment on the time spent issue with respect to Pulver.  Accordingly,

Dollar General's motions for summary judgement as to both Anderson and

Pulver are denied insofar as they seek dismissal based on the time spent

27

issue.

## 2.    Relative Importance of Managerial and Non-Managerial Duties

This finding, however, does not end the primary duty inquiry.  As noted above, "time alone is not the sole test," and the court must proceed to an examination of the second factor—the relative importance of managerial and non-managerial duties.  This factor evaluates which of plaintiffs' duties—managerial or non-managerial—were more important to the employer.  *See Donovan*, 675 F.2d at 521.  In gauging this relative importance, "many courts look to[, among other things,] a manager's training, evaluation, and factors affecting eligibility for bonuses and pay raises."  *Mayne-Harrison v. Dolgencorp, Inc.*, No. 1:09-CV-42, 2010 WL 3717604, at *20 (N.D.W.Va. Sept. 17, 2010) (citing examples).  As many courts have recognized, however, resolving this "difficult and intensive factual inquiry" is generally "inappropriate at summary judgment."  *Indergit*, 2010 WL 1327242, at *6 (collecting cases).

Here, in arguing that plaintiffs' managerial duties were most important to it, Dollar General points primarily to the Store Manager job description, which lists the variety of essential job functions that are managerial in nature; plaintiffs' compensation structure, which provides for higher weekly

earnings and store-performance-based bonuses; and the fact that Store

Managers were evaluated on the basis of management-focused criteria.

In response, plaintiffs point to, among other things, the fact that the

Store Manager job description explicitly contemplates the frequent

performance of manual labor; that plaintiffs' received very little training in

preparation for their role as Store Manager; that plaintiffs' weekly pay,

when accounting for the number of hours worked, was comparable to other

employees; and that Dollar General's restrictive labor budget forced

plaintiffs to perform more non-managerial tasks than they otherwise would

have.  Based primarily on these facts, plaintiffs argue that a reasonable jury

could find that their non-managerial duties were more important to Dollar

General than their managerial duties.

Undoubtedly, each of the facts cited by Dollar General offers support

for the conclusion that it placed significant value on the plaintiffs'

performance of managerial duties.  Moreover, the court is not persuaded

based on plaintiffs' submissions that the second factor should conclusively

weigh in their favor.  Nonetheless, the court does agree with plaintiffs that

summary judgment on this issue, as in most cases, is not warranted here.

As to training, for example, plaintiffs' testimony calls into question the

nature and amount of critical management training plaintiffs actually received.  As other courts have recognized, the extent to which an employer trains its managers is relevant in determining the value that employer places on managerial duties.  *See, e.g.*, *In re Dollar General Stores FLSA Litigation*, Nos. 5:09-MD-1500-JG, 4:09-CV-57-BR, 4:09-CV-58-BR, 2011 WL 197804, at *10 (E.D.N.C. Jan. 19, 2011) (finding that plaintiff's "value to Dollar General [was] shown by the fact that, unlike the other employees in her store, she went through four weeks of training before she was assigned her own store").  In this case, Anderson testified to receiving no additional training when promoted to Store Manager, and Pulver testified that the brunt of her managerial training occurred over the phone.  When viewed in a light most favorable to plaintiffs, these facts cut against a finding in favor of Dollar General.

Similarly, with respect to the Store Manager job description, while Dollar General is correct that it lists numerous managerial functions as "essential," the accuracy of that label is at least somewhat lessened in light of both the limited managerial training plaintiffs appear to have received and the fact that the job description also explicitly contemplates the frequent performance of manual labor.

30

And most significantly in the court's view is the restrictiveness with which Dollar General appears to allot its labor budget.  As noted above, both plaintiffs testified that Dollar General's limited labor budget forced them to spend more time on non-managerial duties than they otherwise would have.  (*See* No. 09-cv-360, Anderson Dep. at 237:11-16, Dkt. No. 38:4; No. 09-cv-363, Pulver Dep. at 287:12-16, Dkt. No. 27:4.)  As Anderson explained, the labor budget operated such that she could typically only schedule herself and one additional employee to be in the store at one time, often requiring her to perform non-managerial tasks such as stocking and cleaning.  (No. 09-cv-360, Anderson Dep. at 236-37, 238-40, Dkt. No. 38:4.)  Pulver testified to operating under similar constraints, explaining that "[w]e all complained about not getting enough hours, every store manager did."  (No. 09-cv-363, Pulver Dep. at 161, Dkt. No. 27:4.)  Pulver further testified that she "wasn't getting the help she needed" with, among other things, "[h]iring certain employees for key positions," which "put more pressure on [her] to open and close stores everyday, rearrange [her] schedule to open and leave and then come back and leave."  (*Id.* at 160-61.)  Given this testimony, the court is unable to definitively conclude, especially in light of other record evidence, that no reasonable jury could

31

find that Dollar General more highly valued plaintiffs' non-managerial duties.  *See, e.g.*, *Pierce v. Dolgencorp, Inc.*, Nos. 3:09cv079 & 4:09cv097, 2011 WL 398366, at *9 (M.D.Pa. Feb. 3, 2011) (denying summary judgment and holding that a reasonable jury could plausibly conclude that plaintiff's managerial duties were less highly valued where employer limited employee's ability to perform managerial tasks by failing to allot more labor hours); *Plaunt v. Dolgencorp, Inc.*, Nos. 3:09cv079 &1:09cv084, 2010 WL 5158620, at *8 (M.D.Pa. Dec. 14, 2010) (same).

On balance, then, having considered the parties' competing arguments and reviewed the record evidence in a light most favorable to plaintiffs, the court is not convinced that Dollar General has conclusively demonstrated an entitlement to summary judgement with respect to the second factor.

### 3.    Relationship Between Salary and Other Employee Wages[7]

––––––––––––––––––––

[7]Ordinarily, the court would next turn to an examination of the third and fourth factors—the frequency with which discretion was exercised and freedom from supervision.  In this case, however, because the court discerns questions of fact with respect to the fifth factor—the relationship between plaintiffs' salary and other employees' wages—the court need not do so, for even if the third and fourth factors were found to decidedly weigh in Dollar General's favor, Dollar General's failure to conclusively establish the fifth, in light of the court's findings above, weighs heavily against summary judgment.

The fifth factor in the primary duty analysis compares an employee's salary to the wages of non-exempt employees performing similar work.  In this case, the parties agree that the relevant comparison is between plaintiffs and their respective ASMs, each of whom, at all relevant times, earned $7.00 per hour.

Dollar General argues that this factor weighs conclusively in its favor because plaintiffs earned significantly more than their ASMs.  In drawing that conclusion, Dollar General compares plaintiffs' weekly salaries with the weekly earning potential of their respective ASMs.  With respect to Anderson, for example, Dollar General compares her $425.00 weekly salary to her ASM's potential weekly earnings of $280.00, and concludes that "Anderson's weekly salary was at least 151% of the weekly earnings of her next highest paid employee."  (No. 1:09-cv-360, Def. Mem. of Law (Anderson) at 14, Dkt. No. 38:2.)  Dollar General also highlights the fact that "Anderson was eligible for up to $10,000 per year in bonuses based upon her store's performance, where her ASM was eligible only for up to $3,000 in bonuses."  (*Id.*)

As to Pulver, Dollar General relies on the same calculation, comparing Pulver's weekly salary—which ranged from $423.00 to

$480.00—to her ASM's potential weekly earnings of $280.00, and finding Pulver's salary to be 151% to 171% of those earnings. (No. 1:09-cv-363, Def. Mem. of Law (Pulver) at 13, Dkt. No. 27:2.)

Plaintiffs counter that their salaries were not significantly higher than their ASMs' potential wages when considering the amount of hours they worked. As to Anderson, for instance, she testified to working an average of fifty hours per week as a Store Manager. When dividing her $425.00 weekly salary, she contends, her effective hourly rate would have been $8.50 an hour, only $1.50 more per hour than her ASM. (*See* No. 1:09-cv-360, Anderson Mem. of Law at 11, Dkt. No. 46.)

Converting Pulver's weekly salary to an hourly rate produces similar results. As noted above, Pulver earned $425.00 per week in the beginning of her employment, and later earned $480.00 per week. Thus, when considering Pulver's testimony that she worked an average of  sixty to sixty-five hours a week, her effective hourly rate was between $6.51 and $7.08 initially, and between $7.38 and $8.00 once her salary increased. (*See* No. 1:09-cv-363, Pulver Mem. of Law at 11, Dkt. No. 29.) Based on these figures, Pulver argues, the gap in earnings between her and her ASM is not so significant as to compel summary judgment on this issue.

(*Id.* at 11-12.)

As the parties' submissions reflect, there is some divergence of opinion with respect to which of these methods of calculation and comparison is the "correct" one.  *Compare, e.g.*, *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1279 (S.D.Fla. 2004) (declining to reduce salary to hourly rate), *with Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 918 (E.D.La. 2009) (finding hourly rate analysis both relevant and appropriate to proper executive exemption determination).  To the limited extent that courts in this Circuit have addressed the issue, however, they have not foreclosed use of the method espoused by plaintiffs, suggesting that the hours worked by an employee can be taken into account.  *See Donovan*, 675 F.2d at 522 (finding that "[a]ssistant [m]anagers earning $250 or more were paid substantially higher wages even *taking their longer hours into account*"(emphasis added)); *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 293 (E.D.N.Y. 2010) (2010) ("[T]here is nothing in the record to render [plaintiff's] counter-argument implausible; namely, that his hourly pay rate, where properly calculated, is substantially less than comparable hourly-wage supervisors .... Given the potential import of an hourly-wage analysis, this Court is compelled to

reject [defendant's] all too pat concern for the burdens of engaging in such 'mathematical gymnastics.'" (citations omitted)).

This court likewise declines to reject plaintiffs' hourly rate conversion. In the court's view, converting plainitffs' weekly salary into an approximate hourly wage is an appropriate way of finding a common basis with which to compare the wages paid to others.  As one court reasoned, "[t]o ignore the fact that [a plaintiff] worked more than forty hours per week would largely frustrate the purpose of this inquiry: to determine whether the employer sought to subvert the FLSA by attaching an overtime exemption to an employee who otherwise performs the same non-exempt tasks as hourly employees." *Plaunt*, 2010 WL 5158620, at *13 ("Without some standard unit, there can be no useful comparison in this already-amorphous inquiry.").  The persuasiveness of this reasoning is enhanced,  in the court's view, when considering the overarching principle that "[e]xemptions from the FLSA are to be narrowly construed against the employer, and [it is] the employer [that] has the burden of establishing an exemption." *Pignataro v. Port Auth. of N.Y. & N.J.*, 593 F.3d 265, 268 (3d Cir. 2010); *Young*, 586 F.3d at 204.

Thus, in viewing the wage and salary evidence in a light most

favorable to plaintiffs—i.e., in accordance with the hourly-rate conversion—the court finds that the question of whether the difference in plaintiffs' salary was so significant as to justify their exemption is one more properly left to a jury.  *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1271 (11th Cir. 2008) (finding that "[g]iven the relatively small difference between the store managers' and assistant managers' hourly rates[—two or three dollars—]it was within the jury's province to conclude that this factor either did not weigh in [defendant's] favor or at least did not outweigh the other factors in Plaintiffs' favor").

And finally, with respect to Anderson, while having considered that she was, in addition to her salary, eligible for a larger bonus than was her ASM, the court is not convinced that that fact compels a contrary result. While a jury could find that this eligibility differential, in light of Anderson's higher salary, renders her compensation significant enough to justify the exemption, it could similarly find that her compensation, including the bonus eligibility, fails to meet that threshold.  *See Clougher*, 696 F. Supp. 2d at 293 ("[D]isparate compensation, even where it includes performance bonuses, stock options, and other tokens of executive employment, has never been held strictly dispositive." (citing, inter alia, *Johnson*, 604 F.

Supp. 2d at 904 (finding fact that bonuses paid to exempt workers is not strictly dispositve)).)  Thus, Anderson's bonus eligibility, while relevant, does not, in the court's view, conclusively tip the scales in favor of summary judgment.

Accordingly, having failed to demonstrate that the fifth factor weighs definitively in its favor, and in light of the court's findings with respect to the first and second factors, Dollar General's motions for summary judgment as to the primary duty issue are denied.

## C.    Liquidated Damages

Finally, Dollar General claims it is entitled to summary judgment on plaintiffs' claims for liquidated damages because it acted in good faith in classifying plaintiffs as exempt employees.  (*See* No. 09-cv-360, Def. Common Br., at 26, Dkt. No. 40.)  At this juncture, the court declines to rule on this issue and denies Dollar General's motion with leave to renew at a later stage of the litigation.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Dollar General's motion to strike certain evidence (No. 09-cv-360, Dkt. No. 50) is **DENIED**; and it is further

**ORDERED** that Dollar General's motions for summary judgment as against Janet Anderson (No. 09-cv-360, Dkt. No. 38) and Betty Pulver (No. 09-cv-363, Dkt. No. 27) are **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

May 6, 2011
Albany, New York

Gary L. Sharpe
U.S. District Judge